**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Anthony J. VESICH, Jr.,
Defendant-Appellant.**

**No. 83–3199.**

United States Court of Appeals,
Fifth Circuit.

Jan. 24, 1984.

Rehearing Denied Feb. 15, 1984.

Daniel J. Markey, Jr., New Orleans, La., for defendant-appellant.

John P. Volz, U.S. Atty., Harry W. McSherry, Ronald A. Fonseca, Lance M. Africk, Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

Before RUBIN, GARWOOD and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge:

Anthony J. Vesich, Jr. appeals from a judgment of conviction for corruptly endeavoring to influence, obstruct and impede the due administration of justice (18 U.S.C. § 1503) and for perjury before a grand jury (18 U.S.C. § 1623). Following a jury trial, Vesich was sentenced to eighteen months' imprisonment on the obstruction charge and eighteen months' imprisonment, twelve of which were suspended, on the perjury charge. The obstruction charge was that on or about January 6, 1982, Vesich advised, urged and attempted to persuade a potential grand jury witness, Robert Fragale, to testify falsely before the United States Grand Jury for the Eastern District of Louisiana. The perjury charge was that during an October 21, 1982 grand jury appearance, Vesich falsely denied advising anyone to lie to a federal grand jury. Vesich's motion for judgment of acquittal was denied by the trial judge. *United States v. Vesich,* 558 F.Supp. 1192 (E.D.La.1983).

Vesich argues on appeal that the evidence was insufficient to establish that a judicial proceeding was "pending" as required to constitute a violation of the "due administration" clause of 18 U.S.C. § 1503 or that he knew of such a proceeding. Vesich also contends that his perjury conviction must be reversed for evidential insufficiency and other grounds. He finally argues that trial testimony referring to "case fixing" and the bribery of a state judge substantially prejudiced his defense and requires a new trial as to both counts. Rejecting these contentions, we affirm.

## OBSTRUCTION OF JUSTICE

Section 1503 is designed to protect individuals involved in federal judicial proceedings, as well as to prevent "miscarriage[s] of Justice by corrupt methods." *Samples v. United States,* 121 F.2d 263, 265 (5th Cir.), *cert. denied,* 314 U.S. 662, 62 S.Ct. 129, 86 L.Ed. 530 (1941). The language of section 1503 in effect in January 1982 was divisible into two parts. Its beginning and more specific language forbade corrupt endeavors to influence, intimidate or impede any witness, juror, or court official, while its concluding omnibus clause punished corrupt endeavors to influence, obstruct, or impede the "due administration of justice." *United States v. Howard,* 569 F.2d 1331, 1333 (5th Cir.), *cert. denied,* 439 U.S. 834, 99 S.Ct. 116, 58 L.Ed.2d 130 (1978).[1]

---

1. The statute read as follows:

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commis-

sioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on

A prerequisite to any violation of section 1503 is the existence of a pending judicial proceeding known to the violator. *Pettibone v. United States,* 148 U.S. 197, 205–07, 13 S.Ct. 542, 546, 37 L.Ed. 419 (1893); *Odom v. United States,* 116 F.2d 996, 998 (5th Cir.), *rev'd on other grounds,* 313 U.S. 544, 61 S.Ct. 957, 85 L.Ed. 1511 (1941); *Howard* at 1337. A grand jury investigation is such a proceeding. *Howard, supra.* Vesich argues that no grand jury proceeding was pending at the time of the alleged obstruction of justice, because the evidence established only the possibility of such a proceeding. The trial judge instructed the jury that a pending judicial proceeding is one that has been "initiated but not yet settled or decided." *See United States v. Koehler,* 544 F.2d 1326, 1328 n. 3 (5th Cir.1977). Vesich did not object to that instruction and does not do so on appeal.

While pendency is clearly a requirement of the statute, we have not had occasion to determine when a judicial proceeding is "pending" for purposes of the "due administration" clause of section 1503. However, we are guided by the decisions of our sister circuits on this issue, as well as by our prior application of the statute. In *United States v. Walasek,* 527 F.2d 676 (3d Cir.1975), the court held that a proceeding was pending after the United States Attorney's office had assigned an investigation to a regularly sitting grand jury and a witness had been subpoenaed and called to testify.[2] While declining "to articulate any necessary minimum set of circumstances," the court found the evidence "sufficient to establish the 'pendency' of a judicial proceeding." *Id.* at 678. The court stated:

"Appellant would have us adopt a rigid rule that a grand jury proceeding is not 'pending' until a grand jury has actually heard testimony or has in some way taken a role in the decision to issue the subpoena. He offers no authority for such a rule, and we are not inclined to adopt it. Appellant is correct in his observation that a grand jury subpoena may become an instrumentality of an investigative agency, without meaningful judicial supervision. Nevertheless, the remedy against potential abuses is not to establish a rule, easily circumvented, by which some formal act of the grand jury will be required to establish 'pendency.' The remedy is rather to continue to inquire, in each case, whether the subpoena is issued in furtherance of an actual grand jury investigation, i.e., to secure a presently contemplated presentation of evidence before the grand jury." *Id.* (footnote omitted).

In *United States v. Simmons,* 591 F.2d 206 (3d Cir.1979), the only evidence submitted on the question of pendency was that a grand jury had been constituted and empaneled and that subpoenas were then issued to appear before it. 591 F.2d at 208. Although in *Simmons,* no witness had appeared to testify before the grand jury at the time of the alleged obstruction of justice, the court declined to distinguish *Walasek* on that ground. The *Simmons* court considered it unnecessary "that the grand

account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or *corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice,* shall be fined not more than $5,000 or imprisoned not more than five years, or both." (Emphasis added.)

The "Victim and Witness Protection Act of 1982," Pub.L. No. 97–291, 96 Stat. 1248 (1982), deleted all references to "witness" in section 1503 and replaced them with separate statutory provisions, effective October 12, 1982. The 1982 act did not alter the "due administration" clause of section 1503.

We have defined the term "administration of justice" as including or consisting of " 'the performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed.' " *Howard* at 1334 n. 4, quoting *United States v. Partin,* 552 F.2d 621, 641 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

**2.** The witness apparently appeared before the grand jury but refused to testify, whereupon a Petition for Immunity was filed and granted. *Walasek* at 678.

jury be aware of the subpoena or otherwise involved in the investigation at the time of the alleged obstruction of justice .... " *Id.* at 210.[3]

■ In both of those cases, subpoenas had been issued by the grand jury at the time pendency was established. However, we do not consider that fact critical to their outcome. As *Simmons* pointed out,

" 'Although grand jury subpoenas are occasionally discussed as if they were the instrumentalities of the grand jury, they are in fact almost universally instrumentalities of the United States Attorney's office or of some other investigative or prosecutorial department of the executive branch.' " *Simmons* at 210, quoting *In re Grand Jury Proceedings,* 486 F.2d 85, 90 (3d Cir.1973).

Further, we have long held that the issuance of a subpoena is not necessary to trigger application of the obstruction of justice statute. *Samples v. United States,* 121 F.2d at 266; *Odom v. United States,* 116 F.2d at 998.[4] As did the *Walasek* and *Simmons* panels, we too decline to establish a rule "by which some formal act of the grand jury will be required to establish 'pendency.' " *Walasek* at 678. Instead, we look to whether the investigating agency has acted "in furtherance of an actual grand jury investigation, i.e., to secure a presently contemplated presentation of evidence before the grand jury." *Id.* In doing so, it is our obligation "to determine not what we might conclude as triers of the fact, but what a reasonable jury could conclude." *United States v. Finney,* 714 F.2d

420, 423 (5th Cir.1983). We must view the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility choices in the government's favor. *United States v. Montemayor,* 703 F.2d 109, 115 (5th Cir. 1983). The test to be applied is "whether a reasonably-minded jury must necessarily entertain a reasonable doubt of the defendant's guilt." *United States v. Ackal,* 706 F.2d 523, 529 (5th Cir.1983), quoting *United States v. Bethea,* 672 F.2d 407, 411 (5th Cir.1982).

■ The chief evidence against Vesich was the tape of a January 6, 1982 telephone conversation between Vesich, a New Orleans attorney of many years' experience and state civil district court commissioner, and Robert Fragale, a former client of Vesich. The government claimed that during that conversation and a January 5, 1982 meeting, Vesich "advised, urged, and attempted to persuade Fragale" to testify falsely before the federal grand jury. The record indicates that at the time of those conversations, Fragale had been told by Assistant United States Attorney Albert Winters that he would be called to testify before a federal grand jury. Winters expected to call Fragale to testify before the United States Grand Jury empaneled in December, 1981 in the Eastern District of Louisiana at New Orleans,[5] and he had taken steps to initiate that appearance: he had secured a written agreement from Fragale to testify whenever called and a state narcotics charge against Fragale had been transferred into federal court.[6] On Decem-

---

**3.** In *United States v. Ryan,* 455 F.2d 728 (9th Cir.1972), the court reversed a conviction under section 1503, noting that there was no proof that the grand jury was involved in an investigation capable of obstruction, *id.* at 735, or that it knew of the issuance of subpoenas to the defendant. *Id.* at 731. However, as the *Ryan* court noted, the subpoenas in *Ryan* were simply used as a means for the Internal Revenue Service to obtain records which it was unable to secure by an administrative subpoena. *Id.* at 732. "It was therefore transparent in *Ryan,* in terms of the *Walasek* test, the subpoenas were not 'issued in furtherance of an actual grand jury investigation ....' " *Simmons* at

209, quoting *Walasek* at 678. We express no disagreement with the *Ryan* holding.

**4.** *Samples* and *Odom* interpreted former 18 U.S.C. §§ 241 and 242 (recodified as 18 U.S.C. § 1503).

**5.** Federal grand juries in New Orleans generally sit for a period of six months.

**6.** Fragale signed the agreement in November 1981, while he was in custody awaiting prosecution on the state charge, as well as an unrelated federal charge. Winters then reached an understanding with the New Orleans Police De-

ber 17, 1981, a federal complaint was filed against Fragale. Winters planned to secure an indictment of Fragale from the December grand jury within thirty days of the complaint,[7] and did so on January 8, 1982. It was his office's general policy to call cooperating witnesses who were under indictment to testify before the same grand jury that indicted them.[8] Winters testified that, pursuant to his office's normal practice when a witness is cooperating with a government investigation, he did not formally subpoena Fragale to testify. Without attempting to "articulate any necessary minimum set of circumstances," we are persuaded that this evidence, if viewed in the light most favorable to the government, is sufficient, though perhaps minimally so, to establish the existence of a pending proceeding.

Our conclusion is buttressed by our previous decisions requiring that the definition of "witness" under section 1503 be "determined with a view to substance, rather than form." *United States v. Chandler,* 604 F.2d 972, 974 (5th Cir.1979), *cert. denied,* 444 U.S. 1104, 100 S.Ct. 1074, 63 L.Ed.2d 317 (1980), quoting *United States v. Grunewald,* 233 F.2d 556, 571 (2d Cir.1956), *rev'd on other grounds,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). In *Chandler,* we applied a "pragmatic definition of a section 1503 'witness' in light of the protective purpose of the obstruction of justice statute . . . ," *id.* at 975, and held that a person who has testified at trial remains a witness within the meaning of section 1503 after the trial has concluded but while the case is on direct appeal before a United States court of appeals. *See also Hunt v. United States,* 400 F.2d 306, 307–08 (5th Cir.1968), *cert. denied,* 393 U.S. 1021, 89 S.Ct. 629, 21 L.Ed.2d 566 (1969) (holding that a person

who had given information to the government, resulting in the filing of a complaint, and who was expected to testify in future legal proceedings, was a witness within the meaning of section 1503 during the period between the preliminary hearing and convening of a grand jury); *Odom v. United States, supra* (holding that an individual was a witness after he had testified in a federal court hearing and was expected to testify in another hearing on the same matter).

◼ We have adopted the rule, first stated in *Odom,* that an individual is a witness "[i]f he knows or is supposed to know material facts, and is expected to testify to them, or be called on to testify, . . . ." *Odom v. United States,* 116 F.2d at 998; *Hunt* at 307; *Chandler* at 974. In those instances in which we applied our pragmatic definition of "witness," judicial proceedings had already occurred in federal court. However, we consistently emphasized the likelihood that the putative witness would testify in the future as the essential factor in evaluating an individual's status as a witness. In this case, the jury could find that both Fragale, the witness, and Winters, the Assistant United States Attorney authorized to act in the matter, mutually expected and intended Fragale to testify before the federal grand jury, and Winters had selected and then intended to use a then empaneled grand jury for that purpose, all in accordance with the standard procedure of the United States Attorney's office. Though these circumstances are perhaps at the outer edge of the required pendency, nevertheless we are of the view that they are not beyond it. To hold them insufficient to trigger application of section 1503 would require a departure from precedent which we are unwilling to make.

---

partment under which the state narcotics charge was *nolle prossed* and a federal narcotics charge was brought.

**7.** Title 18 U.S.C. § 3161(b) requires that an indictment charging a violation of federal law be issued within thirty days of the date on which an individual is arrested or served with a summons in connection with such charge. Winters testified that he read the statute as

requiring the government to indict Fragale within thirty days of the filing of the December 17 complaint.

**8.** Fragale did not testify until September 1982 before a grand jury empaneled in June 1982. According to Winters' testimony, the delay was because a government undercover investigation in which Fragale was participating continued longer than was expected during January 1982.

■ Vesich also argues that, even if a pending judicial proceeding existed in this case, his conviction cannot stand because he was not aware of it. Knowledge and intent are necessary ingredients of an offense under section 1503. *United States v. Haas,* 583 F.2d 216, 220 (5th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1788, 60 L.Ed.2d 240 (1979). To find a violation of the statute, there must not only be a pending judicial proceeding, but the accused must have knowledge or notice of that fact. *Pettibone v. United States,* 148 U.S. at 205–07, 13 S.Ct. at 546; *Odom* at 998. Vesich asserts that he had no knowledge of the existence of any pending grand jury proceeding involving Fragale, much less the particular one alleged by the government to have existed.

■ In evaluating the evidence respecting Vesich's knowledge, the scope of our inquiry is limited. If the jury could legitimately infer beyond a reasonable doubt the existence of such knowledge from the evidence, we may not disturb the verdict. *Odom* at 998–99; *United States v. Bullard,* 458 F.2d 17, 18 (5th Cir.), *cert. denied,* 409 U.S. 916, 93 S.Ct. 247, 34 L.Ed.2d 178 (1972); *United States v. Sink,* 586 F.2d 1041, 1048–49 (5th Cir.1978), *cert. denied,* 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979). It is not necessary that Vesich have known to a certainty that Fragale would appear before a grand jury.

"The knowledge necessary is not absolute or direct knowledge ...; but information or a reasonably founded belief thereof is sufficient to make the requisite scienter; .... And nothing is more common in criminal cases than an infer-

ence of knowledge and motive from circumstances. If they can be logically inferred from what is proven whether they ought to be inferred and how certain the inference is, is for the jury and not for the judge." *Odom* at 998–99.[9] *Accord, Bullard,* 458 F.2d at 18; *Sink* at 1049; *United States v. Arredondo-Morales,* 624 F.2d 681, 684 (5th Cir.1980).

Nor need Vesich have known every detail of the actual pending proceeding. Though we are again at the outer perimeters of the statute, we nevertheless hold it sufficient to meet the knowledge requirement of section 1503 that the jury could conclude beyond a reasonable doubt that Vesich correctly believed that Fragale would appear before a federal grand jury in New Orleans to testify on narcotics trafficking—possibly before an already empaneled grand jury, that Fragale expected this, and that federal prosecutors were already proceeding toward that end.

Vesich conceded at trial that he was told in late December 1981, that the prosecution of Fragale was apparently being transferred to federal court. Fragale testified that Vesich told him in their January 5, 1982 meeting which was not taped, "How they was going to have me [Fragale] before the federal grand jury." Furthermore, Vesich told Fragale in a January 4 recorded conversation that "[t]he feds definitely intend to do something; they're going to do something about your case. John Lawrence [Fragale's attorney] told me." On January 6, Vesich told Fragale that "they[10] wanted to get you over there because they wanted to get everything, you know, that the squad had told them that you were so big." Al-

<hr>

**9.** After noting the accused's knowledge of a pending proceeding, the *Odom* panel found it sufficient that the accused knew the proceeding would "probably" involve testimony from the prospective witness.

*United States v. Baker,* 494 F.2d 1262 (6th Cir.1974), rejected the argument that *Odom* stands for the proposition "that a reasonably founded belief by the accused that the person he attempts to influence is a witness in a pending federal proceeding furnishes the requisite scienter for a violation of 18 U.S.C. § 1503." *Id.* at 1265. In *Baker,* the evidence did not demonstrate that the alleged threat to a section

1503 witness related to the witness' pending testimony in a federal proceeding. The court noted that the defendant had other reasons for making the threat, and may have not even known of the existence of any federal investigation involving the witness. *Odom* was thus factually distinguishable. *Baker* at 1265. Here, the jury could legitimately conclude that Vesich's urgings were directed to Fragale's expected federal grand jury testimony.

**10.** "They" apparently referred to the United States Attorney's office.

though Vesich told Fragale that Fragale would probably not be called to testify until after the pending criminal charges against him were disposed of, it could be inferred that Vesich, as an experienced attorney,[11] was aware that those charges could be disposed of within a brief time by a variety of means.[12] It could also be inferred that Vesich knew that a federal grand jury was virtually always sitting in New Orleans, and that Fragale could well be called to testify before one that had already been empaneled before January 5. And, there is certainly no suggestion to the contrary. Vesich's uncertainty as to precisely when Fragale would be called to testify does not require his acquittal. The evidence affords ample support for the conclusion that Vesich was not discussing with Fragale the mere hypothetical, abstract or theoretical possibility that Fragale would testify at some remote and uncertain future time. Nor is there any suggestion in the evidence that he was discussing a *different* grand jury proceeding with Fragale than the one actually then pending. To the contrary, Vesich's statement to Fragale that "they was going to have" him "before *the* federal grand jury" may be understood as referring to the, or a, present grand jury and also as indicating that it was not important to Vesich which federal grand jury Fragale would appear before. Without attempting to establish a precise or all encompassing rule, we hold that the record provides sufficient evidence of Vesich's knowledge of the pendency of the grand jury proceeding to satisfy the scienter requirement of section 1503.

## PERJURY

Vesich's conviction for perjury in violation of 18 U.S.C. § 1623 was based on his grand jury appearance in October 1982, during which he denied ever advising any individual to lie before a grand jury.[13] He argues on appeal that the evidence was insufficient to support his conviction on the perjury charge.

 Vesich asserts that the recording of his January 6, 1982 conversation with Fragale demonstrates that he was not urging or advising Fragale to lie, but only telling Fragale to be careful if he should choose that course of action. Thus, Vesich reasons, his denial that he had advised Fragale to lie was accurate. Vesich is correct that in order to establish a violation of section 1623, the evidence must show that Vesich in fact advised Fragale to lie to the grand jury. Otherwise, Vesich was testifying truthfully when he denied giving such advice. We find that the trial jury, considering the record as a whole, could conclude beyond a reasonable doubt that during Vesich's January 5 and 6, 1982 conversations with Fragale, Vesich advised Fragale to lie to the grand jury.

While Fragale was incarcerated in New Orleans in late 1981, he was visited four times by Vesich, and after Fragale's release, Vesich attempted to contact him. When the two men met on January 5, ac-

---

**11.** Vesich had practiced law in New Orleans for thirty-two years at the time of trial. His practice had included representation of criminal defendants in both state and federal courts there. He had also served in the Louisiana Legislature for sixteen years. The evidence, including Vesich's testimony, reflected that he had a detailed and practical working knowledge of and experience with the operations of the criminal justice system, including state and federal grand juries and pretrial criminal procedures, plea bargaining and investigations.

**12.** For instance, a plea bargaining agreement, an outright dismissal, or a trial on the merits.

**13.** The allegedly perjured testimony was as follows:

"Q. Did you ever advise or suggest to anyone that he or she should lie before a federal grand jury if you felt the government could not prove a perjury case?
"A. To a lawyer?
" . . . .
"Q. To a client.
"A. Oh.
"Q. A client or anyone else. Have you ever advised any person that that person, he or she, should lie before a federal grand jury if you felt that the government could not prove perjury?
"A. No.
"Q. Your answer is no?
"A. (Witness nods head affirmatively)."

cording to Fragale's testimony, Vesich advised him to lie to the grand jury, as other individuals had in the past. Fragale testified that Vesich assured him his perjury would not be detected.[14] Although Vesich's version of that conversation was substantially different, it was the jury's prerogative, after assessing the credibility of both witnesses, to believe Fragale.[15] In their January 6 conversation, Vesich explained to Fragale at length how Fragale could successfully lie to the grand jury if he were called to testify.[16] Upon listening to the recording of Vesich's language and tone of voice during that conversation, the jury was plainly justified in concluding that Vesich was not merely a disinterested party explaining the workings of the grand jury system, but meant his words to encourage and advise Fragale to lie to the grand jury.[17] *Knight v. United States,* 310 F.2d 305, 307–08 (5th Cir.1962); *Odom v. United States,* 116 F.2d at 998–99. The issue of intent, as of knowledge, is normally one of fact for the jury. *See, e.g., United States v. Sink,* 586 F.2d at 1048–49.

Vesich also argues that he recanted his false testimony and thus cannot be convicted of perjury. Title 18 U.S.C. § 1623(d) provides:

**14.** Fragale's testimony was in part as follows: "[H]e [Vesich] said how they was going to have me before the federal grand jury, and I asked him what I should do about it. *He advised me* that—for me *to do like John Miorana and Raymond did.* These were other people that . . . I knew and in the narcotics field. *'Give them phony names,* give them people that were dead, people that were in jail or out of the country.' Because he said, 'just give them anybody you want; they can't prove that you are not lying.'" (Emphasis added.)

**15.** Vesich testified that Fragale raised the possibility of lying to the grand jury by telling Vesich that he could not testify truthfully. Vesich's version of the meeting varied from Fragale's on several other points, and contradicted the testimony of an F.B.I. agent who overheard a portion of their conversation. The jury may well have concluded that Vesich's testimony was false and thus indicative of his knowledge of his own guilt.

**16.** The following is a portion of the transcription of their recorded conversation:

"[Fragale]: . . . I talked to Cook [another attorney] yesterday, after I talked to you, because I was kind of concerned, and he said—he said not to worry about it, but you know, like I told him, I said, 'Man, I can't go up there and tell them people anything.' I said ah—

"[Vesich]: That's why I told you to get a story straight for when you do go. 'Yea, my connection was Joe Blow, Peter Phenerk [phonetic],' and all that, and they'd be gone. Now they can't do you nothing for that, Bob.

"[Fragale]: What if they prove you're lying? They can give—

"[Vesich]: How can they prove you're lying? *If they say, 'Bob, who was your connection?' say, 'My connection—my connection was* Jim Bowie, he's dead. *Peter so-and-so, he fled the country.* That's my connections.'

No they can't, how they gonna prove that? They ain't going to believe you, they ain't going to like what you tell them, and they're going to go back and tell the judge that you haven't cooperated—or some part of your sentence, but they ain't gonna believe you, but they can't do a . . . thing, Bob.

"[Fragale]: Well, as long as they can't prove you're lying, you mean.

"[Vesich]: Right, how they gonna prove you're lying?

"[Fragale]: 'Cause, you know, I don't know. That's what I was worried about." (Emphasis added.)

**17.** In challenging the sufficiency of the evidence, Vesich suggests that when testifying before the grand jury, he did not remember his conversation with Fragale and thus did not know his testimony was false. He notes that two physicians testified at trial that Vesich was afflicted with an organic brain deficiency which adversely affected his memory, and he points out that his grand jury testimony occurred approximately ten months after his January conversations with Fragale. Vesich also testified at trial that when he appeared before the grand jury, he did not realize the prosecutors' questions related to a conversation with Fragale. However, in their testimony the physicians did not purport to preclude the possibility that Vesich could have remembered his conversations with Fragale when testifying before the grand jury. Indeed, Vesich's detailed recollection at trial of several other conversations occurring more than ten months previously may have indicated to the jury that Vesich's memory was quite adequate to recollect during his grand jury testimony what he had told Fragale on January 5 and 6.

Vesich also asserts that his allegedly perjurious testimony, considered in context, did not amount to a denial of advising anyone to lie. The record simply does not support the assertion.

"(d) Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed."

In order to recant pursuant to section 1623(d), "the witness must, as a condition precedent to giving truthful testimony, admit that his perjurious testimony was false." *United States v. D'Auria,* 672 F.2d 1085, 1091–92 (2d Cir.1982). We need not decide at this time whether "[a]n outright retraction and repudiation of his false testimony is essential to a 'recantation' within the meaning of the statute," *id.* at 1092, for Vesich never informed the grand jury that his false testimony was even possibly inaccurate or misleading. After denying that he had ever advised anyone to lie to the grand jury, Vesich repeatedly responded to similar questions relating to his January 6 statements to Fragale by professing a failure to recall the statements. Vesich's claims of memory loss hardly constituted a recantation of his false testimony. The trial jury could well conclude that, to the contrary, those assertions also were perjurious. Having not properly availed himself of the recantation provision of section 1623(d), we reject Vesich's assertion that he established a recantation defense precluding his perjury conviction. *See United States v. Denison,* 663 F.2d 611, 618 (5th Cir.1981).

Vesich argues that the grand jury investigation was used as a subterfuge to elicit perjury from him, pointing out that he was repeatedly questioned about his January 6 conversation with Fragale, even though prosecutors possessed a recording of the conversation, and, Vesich argues, thus did not need his answers. Prosecutors never informed Vesich during his grand jury testimony of the existence of the tape or that their questions specifically concerned the January 6 conversation. Vesich argues, in effect, that the grand jury's conduct exceeded its power and amounted to an abuse of process. *See Bursey v. United States,* 466 F.2d 1059, 1079–80 (9th Cir.1972); *Brown v. United States,* 245 F.2d 549, 554–55 (8th Cir.1957).

We do not share the defendant's conclusion. The record does not establish that Vesich would not have been summoned to testify absent a purpose of procuring his indictment for perjury. "Traditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law." *United States v. Sells Engineering, Inc.,* —— U.S. ——, ——, 103 S.Ct. 3133, 3137, 77 L.Ed.2d 743 (1983), quoting *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974); *accord, United States v. Dionisio,* 410 U.S. 1, 17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973); *United States v. Echols,* 542 F.2d 948, 951 (5th Cir.1976), *cert. denied,* 431 U.S. 904, 97 S.Ct. 1695, 52 L.Ed.2d 387 (1977). "A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.'" *Branzburg v. Hayes,* 408 U.S. 665, 701, 92 S.Ct. 2646, 2666, 33 L.Ed.2d 626 (1972), quoting *United States v. Stone,* 429 F.2d 138, 140 (2d Cir.1970).

In *United States v. Phillips,* 540 F.2d 319 (8th Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976), the court rejected a similar argument to that made by Vesich. In *Phillips,* the grand jury possessed a tape recording of a certain incriminating statement by a witness. The witness was summoned to testify and repeatedly denied ever making the statement, whereupon he was indicted for violating 18 U.S.C. § 1623. On appeal of his conviction, the defendant-witness argued that the grand jury had no need to ask him about the recorded statement, because the grand jury already knew what he had said. Therefore, the defendant reasoned, his answer was not material to the grand jury investigation and thus did not constitute perjury. The Court responded:

"[M]ateriality of statements made in a grand jury investigation may more readily appear than that of similar evidence offered on an issue in civil or criminal litigation, since the purpose of the investigation is to get at facts which will enable the grand jury to determine whether formal charges should be made against someone rather than prove matters directly at issue. * * * Leads to further inquiry may be of material worth to an investigation." *Id.* at 328, quoting *United States v. Stone,* 429 F.2d at 140.

Although the precise ground of error raised in *Phillips* is not argued here,[18] the *Phillips* rationale applies equally in this case. *See also United States v. Richardson,* 596 F.2d 157, 165 (6th Cir.1979); *United States v. Carson,* 464 F.2d 424, 436 (2d Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972); *United States v. Sweig,* 441 F.2d 114, 120–21 (2d Cir.), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971); *United States v. Nickels,* 502 F.2d 1173, 1176–77 (7th Cir.1974), *cert. denied,* 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976).

As the trial court here aptly stated: "[T]he Grand Jury prior to proceeding to indict the defendant for obstruction of justice, and in its investigation of such charge itself, had the right to explore every avenue in connection therewith, including whether or not Vesich would admit it. Further, in such investigation,

the Grand Jury had the right to observe the witness's spontaneous response to such questioning . . . ." *United States v. Vesich,* 558 F.Supp. at 1198.

Furthermore, the questioning might have led to evidence of other obstructions of justice of which the witness knew or in which he had participated. The grand jurors were not obliged to assume that Vesich would choose to commit perjury, particularly after he was advised of his rights—including his right to refuse to answer incriminating questions, warned he was subject to the laws of perjury, told of his right to an attorney, asked if one was present outside the jury room, and invited to talk with his attorney. *Id.* Vesich also was advised before his grand jury appearance that he was the subject of a grand jury investigation and that voice exemplars would be requested of him, a request that was calculated to and did in fact signal to his attorney that the prosecutors might have incriminating tapes. Moreover, the grand jury transcript revealed that Vesich was questioned about possible obstructions of justice committed by two other individuals. "Therefore, it can hardly be argued that the sole purpose of having the defendant before the Grand Jury was to induce perjury." *Id.* at 1199. "[N]othing remotely akin to 'entrapment' or abuse of process is suggested by what occurred here." *United States v. Mandujano,* 425 U.S. 564, 583, 96 S.Ct. 1768, 1779, 48 L.Ed.2d 212 (1976)[19]

**18.** In his motion for judgment of acquittal, Vesich argued that his allegedly perjurious testimony was not material, and thus was insufficient to permit a perjury conviction. *United States v. Vesich,* 558 F.Supp. 1192, 1197 (E.D. La.1983). He does not make that argument on appeal.

**19.** *Bursey v. United States,* 466 F.2d 1059 (9th Cir.1972), cited by Vesich, is not applicable. In *Bursey,* prosecutors repeatedly called witnesses to testify over a period of several months and subjected them to repetitious questions. Upon the witnesses' refusal to answer questions they had already answered, they were found in contempt. The Ninth Circuit struck down the contempt citations, holding that the use of the grand jury function in this manner violated the witnesses' Fifth Amendment right to due process of law. *Id.* at 1079–81. The

*Bursey* court noted that "[c]ompelling a witness to answer a question to which he had previously responded adds very little to a grand jury's store of information," while exposing the witness to the "hovering possibility" that inconsistencies in his answers could lead to a perjury prosecution, as well as to the risk that his earlier answers might be construed as a waiver of his First and Fifth Amendment rights. *Id.* at 1079.

This case presents an entirely different situation. Vesich was not prosecuted for a failure to answer a question to which he had previously responded, but for knowingly denying that he had committed a specific act, *i.e.,* advising Fragale to commit perjury. *That* act had none of the compulsory elements inherent in grand jury testimony, nor was it elicited by the government. Further, Vesich did not refuse to

## EVIDENCE CONCERNING EXTRANEOUS CONDUCT

Vesich claims that the trial court erroneously admitted prejudicial testimony from Fragale indicating that Vesich had bribed a state court judge and "fixed" an earlier case on behalf of Fragale. Evidence of a defendant's prior acts introduced solely to demonstrate his bad character is not admissible. Fed.R.Evid. 404. *United States v. Beechum,* 582 F.2d 898, 910 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); *United States v. Shaw,* 714 F.2d 544, 545 (5th Cir. 1983). Such evidence may be admissible for other purposes, such as proof of motive or intent, but only if its probative value is not substantially outweighed by, among other factors, a danger of unfair prejudice. Fed. R.Evid. 403, 404(b). *Beechum* at 910–11.

The first claimed reference to the prior wrongful acts evidence about which Vesich complains was contained in a question to Fragale by the prosecution on direct examination. Fragale was asked whether he had relayed to the government any information he had received from Vesich concerning the bribery of a state court judge, and he responded affirmatively. No objection was made by defendant's counsel. Several minutes later, over the objection of defense counsel, the prosecution again asked virtually the identical question of Fragale, and again received an affirmative response. The failure of defense counsel to object to admission of the initial bribery evidence at the first available opportunity served to waive any ground of complaint against its admission, absent plain error. Fed.R.Evid. 103. *See United States v. Ward,* 481 F.2d 185, 187 (5th Cir.1973); *United States v. Briggs,* 457 F.2d 908, 911 (2d Cir.), *cert. denied,* 409 U.S. 986, 93 S.Ct. 337, 34 L.Ed.2d 251 (1972); 1 J. Wigmore, *A Treatise on the Anglo-American System of Evidence in Trials at Common Law,* § 18, at 323 (1940); E. Cleary, *McCormick's Handbook of the Law of Evidence,* § 52, at 113 (2d ed. 1972). In view of the absence of timely objection, we find that the admission of the initial bribery testimony was not so prejudicial as to undermine the "fairness, integrity, or public reputation" of defendant's trial and amount to plain error. Fed. R.Evid. 103(d). *United States v. Brown,* 548 F.2d 1194, 1207 (5th Cir.1977); *United States v. Cook,* 586 F.2d 572, 579 (5th Cir. 1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979). On the second occasion, Vesich's counsel neither objected to the then elicited testimony as being repetitious, nor objected to, or moved to strike or instruct the jury to disregard, the earlier virtually identical testimony of the same witness. Accordingly, overruling of the objection to the later testimony, even were such action improper, did not, under the facts of this case, affect Vesich's substantial rights. Fed.R.Evid. 103(a). *See United States v. McGuire,* 435 F.2d 139 (5th Cir. 1970); *MacCurdy v. United States,* 246 F.2d 67, 68 (5th Cir.1957); *Belmont Industries, Inc. v. Bethlehem Steel Corp.,* 512 F.2d 434, 437 & n. 5 (3d Cir.1975); *United States v.*

---

answer the grand jury's question; he answered it falsely.

> "[I]t cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked. Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood." *Bryson v. United States,* 396 U.S. 64, 72, 90 S.Ct. 355, 360, 24 L.Ed.2d 264 (1969) (footnote omitted).

Although we hold that the evidence in this case does not establish Vesich's allegation that he was called to testify in order to elicit perjury from him, we do not thereby suggest that the perjury conviction would be invalid if Vesich's allegation were true. *Cf. United States v. Wong,* 431 U.S. 174, 177–80, 97 S.Ct. 1823, 1825–26, 52 L.Ed.2d 231 (1977) (upholding 18 U.S.C. § 1623 perjury conviction despite alleged denial of due process by failure to effectively advise defendant before testifying of right against self-incrimination). *But cf. Brown v. United States,* 245 F.2d 549, 554–55 (8th Cir.1957) (invalidating perjury conviction when defendant brought before grand jury solely to obtain perjury indictment and testimony neither relevant nor material to matters within panel's competence). Such a question is not before us.

 

*Jamerson,* 549 F.2d 1263, 1266–67 (9th Cir. 1977); *Small v. Olympic Prefabricators, Inc.,* 588 F.2d 287, 290–91 (9th Cir.1978).[20]

■ The first direct reference made by Fragale to prior illegal conduct by the defendant was contained in an answer to a question posed by defense counsel on cross-examination.[21] Defense counsel never objected to Fragale's unresponsive answer. On appeal, Vesich attempted to explain the absence of an objection by reasoning that it would have been pointless, given the failure of the earlier objection to the prosecutor's bribery question. The earlier testimony, however, did not expressly implicate Vesich. Moreover, Fragale's allegedly prejudicial testimony on cross-examination was objectionable as unresponsive, and the ground given by the trial court for overruling the first objection—that the evidence was relevant to the reasons for the government's investigation—were not applicable to Fragale's later statement. Defense counsel made no request at any time for a curative jury instruction or a mistrial. To the contrary, counsel continued to pursue questions on "case fixing" at some length during cross-examination of Fragale. If counsel feared the prejudicial effect of this "case-fixing" answer on cross-examination, they could have requested a curative instruction or a mistrial after Fragale's initial unresponsive answer. If denied, they might then have had no choice but to continue the questioning. Yet no such objection or motion was ever made, and thus the trial court

was never given an opportunity to devise an appropriate remedy for whatever prejudice occurred. We do not believe that Fragale's unresponsive answer on cross-examination was so prejudicial as to render its admission such plain error as to require reversal.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

**20.** The testimony does not state that Vesich was or had claimed to be responsible for the alleged bribe. Defendant also contends that the prosecution was precluded from bringing out evidence of any extrinsic offenses by the accused because the prosecution stated during pretrial omnibus proceedings that it had no such information. However, defense counsel never presented this argument to the trial court. We have stated under virtually identical circumstances that "this is the kind of argument that must be specifically asserted before the trial court to be reviewable on appeal." *United States v. Urdiales,* 523 F.2d 1245, 1247 (5th Cir.1975), *cert. denied,* 426 U.S. 920, 96 S.Ct. 2625, 49 L.Ed.2d 373 (1976); *accord, United States v. Witt,* 618 F.2d 283, 286–87 (5th Cir.), *cert. denied,* 449 U.S. 882, 101 S.Ct. 234, 66 L.Ed.2d 107 (1980).

**21.** The pertinent testimony was as follows:
"Q [By Defense Counsel]: Why did you call him (Vesich) from Las Vegas, and why did you call him from San Diego?
"A [By Fragale]: Because he was my attorney in the past.
"Q In the past.
"A Yes.
"Q He wasn't your attorney then?
"A No, not on the record.
"Q What did you want your former attorney to do for you in New Orleans when you were in Las Vegas?
"A I wanted him to see if he could fix my charge over there and get it dropped for me like he did on the first one."